UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DAVID FLETCHER ) | Case No. 4:09-cr-53<br><br>*Mattice / Lee* |

## REPORT AND RECOMMENDATION

Before the Court is the motion of Defendant David Fletcher to suppress a firearm discovered during a search of his person following a traffic stop on May 13, 2009 [Doc. 11].[1] At the evidentiary hearing, Defendant conceded that his motion seeking exclusion of the handgun turns on whether the initial traffic stop was proper. After considering the evidence and the arguments, I find that it was, and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     BACKGROUND**

At the hearing, the Government offered the testimony of Detectives Jason Kennedy and Jason Ferrell of the Tullahoma Police Department, the only witnesses to testify.[2]

Detective Kennedy testified as follows: He was called to the scene of a home invasion at the Southgate Trailer Park, on the west side of Tullahoma, during the early morning hours of May 12, 2009. Detective Kennedy interviewed the victim at that time and learned that three unidentified

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 12]. The Government filed a response in opposition [Doc. 15] and an evidentiary hearing was held on March 25, 2010. The matter is now ripe for decision.

[2] Although Defendant argued in his brief that he was wearing his seat belt and no traffic infractions were committed, Defendant did not put on any proof at the hearing. In closing argument, Defendant essentially conceded he had no precedent supporting his position given the officers' testimony.

black men had entered the home and shot two holes in the walls. Detective Kennedy interviewed the victim again later that same morning, at about 10:00 a.m., at which time the victim offered three names of suspects which he had learned "on the street." One of those names was "Day Day," later identified as Defendant, but Detective Kennedy did not know who "Day Day" was at the time, or that he was a convicted felon. Detective Kennedy gave the name "Day Day" to several confidential informants ("CIs"), some of whom had heard of "Day Day" and knew he was in Tullahoma, but had no more information at that time.

The next day, about an hour before the traffic stop, Detective Kennedy received information from a CI that "Day Day" had been seen in a Chevrolet Impala with a loaded firearm in his waistband. The CI told Detective Kennedy that "Day Day" had just left Wagner Street with Kenneth Jeremy Blair ("Blair"), and the CI believed they were headed to the east side of town where "Day Day" was staying. Detective Kennedy had reason to believe the CI's tip was accurate: the CI had produced information in the past regarding the location of wanted suspects and had in all cases proven reliable. The CI had been paid for providing information on prior occasions.

Detective Kennedy, accompanied by Sergeant Ferrell, went to look for the Chevrolet Impala during the early afternoon of May 13. Because Detective Kennedy was already investigating Blair for weapons and drug offenses, he went to East Grundy Street, on the east side of town, to a crack house that Blair was known to frequent. At the crack house, Detective Kennedy spotted the Impala, and he saw two men, one of whom he recognized as Blair and another who turned out to be the Defendant exit the crack house and get into the Impala to leave.

Detective Kennedy was driving an unmarked car, and he followed Blair and Defendant for about a half mile. At his closest, Detective Kennedy was approximately one car length behind the

2

Impala. "Just shortly" after the Impala left the crack house, Detective Kennedy observed the car cross the center line of the road. Detective Kennedy recalled that the center line was a double solid yellow line. He also observed that Defendant, who was sitting in the front passenger seat, was not wearing a seat belt. The buckle of the passenger's seat belt was hanging to the right of the passenger, unfastened.

Detective Kennedy had some officer safety concerns because of the tip about the loaded firearm, so he did not stop the car immediately after the traffic infractions. Instead, he continued to follow the car for about a half mile, when the car stopped in an apartment parking lot. Detective Kennedy then initiated the traffic stop. He approached the car and informed its occupants that he had stopped them because they crossed the center line and because the passenger was not wearing a seat belt. He testified that he stopped them because of the traffic infractions *and* the firearm, but he did not ultimately issue a citation for the traffic offenses.

Sergeant Ferrell testified as follows: On the day of the traffic stop, he was asked by Detective Kennedy to ride along to look for Blair and "Day Day." Detective Kennedy was the lead investigator, so Sergeant Ferrell's information about why they were looking for the men was limited to what he had been told by Detective Kennedy. After they arrived at East Grundy Street, Sergeant Ferrell observed Blair get into the vehicle. He did not see Defendant get into the vehicle, but he remembered seeing a passenger in the vehicle. Sergeant Ferrell recalled that Blair entered the vehicle because he was already familiar with Blair. Both Sergeant Ferrell and Detective Kennedy commented, while following the vehicle, that Blair had crossed the center line. According to Sergeant Ferrell, this did not occur on East Grundy Street, but on East Lincoln Street, after the car had already made two turns, and "relatively close" to where the officers ultimately stopped the

vehicle. On East Lincoln Street, the center line is a single, dashed yellow line. Sergeant Ferrell believed that crossing a dashed center line is not an infraction by itself, but a "swerve" over the line can be and may indicate that a driver is impaired. Sergeant Ferrell also remembered commenting that the passenger did not have a seat belt on. Sergeant Ferrell testified it is possible to discern whether a seat belt is fastened by looking to see whether it is hanging down or going across near the roof of the car. Sergeant Ferrell confirmed they were about a car's length from the vehicle. By Sergeant Ferrell's estimate, the officers followed the vehicle for a total of a half mile to a mile before stopping it.

## II.  ANALYSIS

Defendant seeks to suppress the firearm found on his person, arguing that neither he nor Blair committed any infractions justifying a traffic stop and that the stop was pretextual. A traffic stop is a seizure of both the driver and any passengers in the vehicle, *see Brendlin v. California*, 551 U.S. 249, 256-57 (2007); *United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009), and any evidence seized during an unlawful traffic stop must be suppressed, *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). The United States Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748. Because the officers seized the firearm without a warrant, the burden of proof rests on the Government to show that it was nonetheless lawful. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) ("The government has the burden of proving the legality of a warrantless search.").

The Government argues the traffic stop was justified under either test. First, the Government

argues the officers had reasonable suspicion to conduct an investigatory *Terry* stop because of Defendant's suspected involvement in the previous morning's home invasion and the CI's tip that Defendant was carrying a weapon. An officer may stop and briefly detain a suspect when the "officer has [a] reasonable, articulable suspicion that [a] person has been, is, or is about to be engaged in criminal activity." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (second alteration in original) (emphasis omitted). In other words, the officers must have reason to believe that criminal activity "may be afoot." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). A "hunch" or "unparticularized suspicion" is not enough; the officer must be "able to articulate some minimal level of objective justification for making the stop." *Id.* (quoting *United States v. Waldon*, 206 F.3d 597, 604 (6th Cir. 2000)).

Here, I **FIND** the officers' knowledge met this "minimal" burden. The victim of the previous morning's home invasion told Detective Kennedy that a man known as "Day Day" may have been involved in the crime. This tip alone may not have been enough to justify the stop because the victim merely heard this name "on the street" and the report carried no indicia of inherent reliability. *See United States v. Atchley*, 474 F.3d 840, 848 (6th Cir. 2007). Later, however, a reliable CI told Detective Kennedy that he observed "Day Day" in the company of Blair, carrying a handgun in his waistband. Again, this tip by itself may not have provided reasonable suspicion for the stop because the officers were unaware that "Day Day" was a convicted felon and his possession of a gun was illegal. *See United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (lawfulness of traffic stop turns on "what the officer knew *at the time he made the stop*."). But the officers had still more to arouse their suspicions. They observed Defendant exit a known crack house with Blair, whom they knew to be involved in weapons and drug offenses, only a short time

5

after receiving the reliable tip that Defendant was in possession of a handgun. Taken all together, these circumstances justify a brief detention to confirm or dispel the officers' suspicions that criminal activity may have been afoot.

Second, the Government argues that even if the officers lacked reasonable suspicion to conduct a *Terry* stop, they nevertheless had probable cause to believe a traffic infraction had occurred or was occurring.[3] Two traffic infractions are at issue: crossing the center line and failing to wear a seat belt. Both officers testified the vehicle crossed the center line, although their descriptions differed to some degree. Detective Kennedy testified the vehicle crossed a double solid line, presumably on East Grundy Street, "just shortly" after leaving the crack house, while Sergeant Ferrell testified it crossed a single dashed line on East Lincoln Street, "relatively close" to where the car was ultimately stopped. I **FIND** these minor discrepancies are not sufficient to undermine the officers' credibility because each officer's testimony corroborated the other's in various key respects. Both testified they observed the Impala, with Blair at the wheel and a passenger they did not recognize, leave a known crack house on East Grundy Street. They both testified they followed the vehicle for a short distance. And finally, they both testified they observed the vehicle cross the center line.

While I credit each officer's testimony that the car crossed the center line of the road, I do

---

[3] The briefs do not address whether the traffic violations, crossing the center line and failure to wear a seat belt, are civil infractions (in which case the officers needed probable cause of a violation) or criminal offenses (in which case the officers needed only reasonable suspicion). *See Blair*, 524 F.3d at 748. It appears that either may constitute a class C misdemeanor under Tennessee law. Tenn. Code Ann. §§ 55-8-103; 55-8-121; 55-9-603(a)(2), (d)(1). The distinction is ultimately of no consequence here, however, because the Government's proof meets the more strenuous probable cause standard with respect to at least one of the infractions.

not make a finding of whether the officers had probable cause to believe a traffic infraction was thereby committed. As noted, Detective Kennedy testified the car crossed a double solid yellow line, while Sergeant Ferrell testified the car crossed a single dashed yellow line.[4] Because the officers' accounts diverge on this point, it is difficult to determine whether the officers had probable cause for the stop based solely on Blair's crossing the center line.

It is also unnecessary to make that determination. Even without the center line violation, both officers credibly testified they observed Defendant was not wearing a seat belt, which is an infraction sufficient by itself to justify the stop. *United States v. Draper*, 22 F. App'x 413, 414 (6th Cir. 2001); *Vantrease v. Luna*, 2007 WL 2746933, at *9 (M.D. Tenn. Sep. 17, 2007). Both officers testified consistently that they observed Defendant's seat belt hanging unfastened. There was no evidence supporting the contrary conclusion. The visual observation of a traffic infraction certainly supports a finding of probable cause. *See United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999) (detection of speeding vehicle with radar gun justified traffic stop). I **CONCLUDE**, therefore, the stop was supported by probable cause.

Defendant also argues that the traffic infractions were a "ruse" for the "real justification" for the stop--to investigate the tip that Defendant was armed, and presumably, to investigate the previous day's home invasion. Even if true, Defendant's argument is of no legal consequence. Officers will often have unrelated suspicions about a traffic violator, but reviewing courts do not ask whether an officer would have made a traffic stop if not for those unrelated suspicions; they ask only

---

[4] Although Sergeant Ferrell testified that it is illegal to swerve over a broken yellow center line and that such a swerve can show that a driver is impaired, he did not characterize the car's movement as a swerve. Neither officer testified he suspected Blair was impaired in spite of having observed him leaving a known crack house.

whether "this particular officer in fact had probable cause to believe that a traffic offense had occurred." *Ferguson*, 8 F.3d at 391. If so, the stop is reasonable. *Id.* Here, because the stop was supported by probable cause that Defendant was not wearing his seat belt, the traffic stop was reasonable and the evidence seized as a result should not be suppressed.

### III.　CONCLUSION

For the reasons stated above, I **RECOMMEND**[5] that Defendant's motion to suppress [Doc. 11] be **DENIED**.

                                                                              s/*Susan K. Lee*
                                                                              SUSAN K. LEE
                                                                              UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).